**UNITED STATES of America**

v.

**Kani XULAM A/K/A Steven Barry Citron A/K/A Sereno Citron, Appellant.**

**No. 96–3055.**

United States Court of Appeals, District of Columbia Circuit.

May 14, 1996.

Before: WALD, GINSBURG,* and TATEL, Circuit Judges.

*ORDER*

PER CURIAM.

Upon consideration of appellant's motion for release pending appeal of a pretrial detention order, the opposition thereto, and the reply, it is

**ORDERED** that the District Court's detention order be revoked for the reasons stated in the accompanying memorandum. The Clerk is directed to issue forthwith to the District Court a certified copy of this order in lieu of a formal mandate.

Before: WALD, GINSBURG, and TATEL, Circuit Judges.

Opinion for the Court filed PER CURIAM.

Dissenting opinion filed by Circuit Judge GINSBURG.

PER CURIAM:

This appeal from an order of detention pending trial under 18 U.S.C. § 3142 raises troubling issues as to the quantum of evidence necessary to detain an individual prior to trial on the ground that "no condition or combination of conditions will reasonably assure" the presence of the appellant at future court proceedings. This appellant, a Kurd from Turkey, has been an international human rights worker resident in the District of Columbia for over three years and a well-known and admired member of the national human rights community. He has no criminal record, but has been charged with making a false statement in a passport application in 1988. In short, after arriving here from Canada on a temporary student visa, he applied for and obtained an American passport under a false name. If convicted, he likely faces a maximum sentence of six months under the federal sentencing guidelines. The Immigration and Naturalization Service ("INS") has served notice that it is undertaking an investigation which may result in appellant's possible deportation and has lodged a detainer to take effect upon his

* Judge Ginsburg would deny the motion for the reasons stated in his dissent.

release.[1] The magistrate judge and the district court, on motion of the government, ordered his detention pending trial in the Central District of California solely as a flight risk, conceding he posed no danger to the community or any of its citizens. At the present time, a pretrial detention hearing has been scheduled before the California court.

■ The Bail Reform Act requires release of a defendant prior to trial unless a judicial officer determines that no conditions or combination of conditions exist which will "reasonably assure the appearance of the person." 18 U.S.C. § 3142(c) (1994). Under the Act, when the government seeks pretrial detention of an individual on the ground that he poses a risk of flight, the standard it must satisfy is a "preponderance of the evidence." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C.Cir.1987). That preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful—can "reasonably" assure that the defendant will appear for trial. 18 U.S.C. § 3142(c). The Act sets out a number of conditions which may be used to ensure appearance, including, *inter alia*, remaining in custody of a designated person who agrees to assume supervision and to report any violation of a release condition; maintaining employment; abiding by restrictions on place of abode or travel; reporting on a regular basis to a designated law enforcement agency; complying with a curfew; executing a bail bond; and a final catch-all for any condition that the magistrate or judge deems "reasonably necessary" to assure appearance. 18 U.S.C. § 3142(c). Section 3142(g) of the Act sets out the factors to be considered by the magistrate or judge in deciding whether available conditions will reasonably assure the defendant's appearance: the nature and circumstances of the offense, particularly its nonviolent nature; the weight of the evidence; the history and characteristics of the person, including his character, family ties, employment, length of residence in the community, community ties, past conduct, criminal history, and record of court appearances; and the danger the defendant poses to the community if released.

■ In *every* category mentioned in the statute, this appellant was a prime candidate for release. His nonviolent charge carried a maximum of six months imprisonment under the sentencing guidelines; he had no criminal record or record of failure to appear; he was employed and had a wide circle of respected acquaintances and close friends in the community who testified as to his "spiritual" and "intellectual" integrity; and the government acknowledged that he posed no threat to the community. Indeed, the district court admitted that if he were facing only the criminal charge, his "chances [of appearing] might be good." Nonetheless, the magistrate and district court judge refused to release him pending trial. What militated against him, in the judge's view, was that the government witness testified that he might be facing deportation to Turkey, where as a Kurd he might be persecuted. The court also believed that "he will go to any other ends ... to address [the] cause [of Kurdish rights], especially when he now realizes there's a possibility he could be deported." For that reason, the judge concluded that there would be "no way that [a third-party custodian] can lock him up or restrain him from leaving." Obviously troubled, he added that the magistrate to whom the appellant is presented after transportation to California "may very well decide to disagree with the decision this court has made" and "nothing in my decision should suggest to [the California magistrate] that ... he does not have jurisdiction to fully consider the issue of bond." It was then clearly the appellant's alleged crime—the

---

1. In the event that appellant is released in the wake of this order, the INS may request the criminal justice agency now holding appellant to "maintain custody of the alien for a period not to exceed forty-eight hours, in order to permit assumption of custody by the Service." 8 C.F.R. § 242.2(a)(4). In a supplemental memorandum to this court, the government states that it "has no representations to make to the Court about whether the INS intends to take appellant into custody. The fact that a detainer has been lodged does not mean appellant necessarily will be taken into custody by the INS if released by this Court." Appellee's Supplemental Memorandum in Opposition to Appellant's Motion for Release Pending Appeal, at 4 n. 1.

false identity he claimed to obtain a passport, for which he is presumed innocent—and the possibility of his deportation to Turkey that fueled the judge's decision.

There are several reasons why we do not believe those factors alone provided a legitimate ground for ordering pretrial detention. First, we are not convinced that the government satisfied its burden of showing a risk of flight. *Cf. United States v. Friedman,* 837 F.2d 48, 49–50 (2d Cir.1988) (vacating pretrial detention order on grounds that government had not established risk of flight; although charges for sending and receiving child pornography were serious, chance of flight was reduced by absence of prior criminal record, lack of known ability to flee, employment, and family and community ties); *United States v. Himler,* 797 F.2d 156, 161–62 (3d Cir.1986) (reversing pretrial detention order because government did not show risk of flight by preponderance of evidence; even though defendant was clearly capable of obtaining false identification, as demonstrated by prior conviction for crime involving fraudulent identification, family ties and past record of appearing in court as required diminished defendant's flight risk). Appellant's strong commitment to advocating his Kurdish cause in the United States, cited by the district court as enhancing his risk of flight, would seem to militate against, not in favor of, flight, since the only way he can pursue that cause is publicly, within the human rights community, and disappearing or fleeing would render him permanently impotent in that respect. How would he be regarded in that community, for instance, if he violated the trust of his third-party custodians, or forfeited bonds or assets they pledged for his release? On a more practical level, the government has taken away all his passports and travel documents, so it is unlikely he could go far even if he wished to. In addition, as explained above, the INS has itself addressed any concerns regarding appellant's risk of flight by lodging a detainer against appellant, which permits his retention for 48 hours after he is otherwise ordered released, and at that point, the agency may opt to take appellant into custody pending deportation proceedings. 8 C.F.R. § 242.2(c).

Second, any or all of the conditions listed above were available in this case, but there is no indication in the record that the magistrate judge or the district court judge fully explored the commitments offered by appellant's witnesses or the appellant's proffer that he was willing to abide by whatever conditions the court imposed. *Cf. United States v. Jackson,* 845 F.2d 1262, 1265–66 (5th Cir.1988) (pretrial detention order vacated for failure adequately to consider statutory factors relevant to determination whether conditions are sufficient to assure appearance in court). One of appellant's witnesses, Sister Patricia Krommer, testified that she would "absolutely" be willing to ensure appellant's return to court. When then asked, "And what kinds of assistance could you offer in that regard?", she answered: "Well, first of all, I would keep in contact with him daily. I would provide transportation. If he needed to appear in court, I would bring him in. I would be happy to monitor his whereabouts each day." A second witness, Kathryn Cameron Porter, president of an international human rights organization (the Human Rights Alliance) and the wife of an eight-term Republican Congressman, John Edward Porter, the founder and co-chair of the Congressional Human Rights Caucus, offered a room in her home, stating that she "most definitely would" be willing to ensure appellant's return to court and that she "would have no hesitancy to be responsible or custodian, or whatever—whatever the correct legal term is. I would have no hesitancy." Joseph Eldridge, director of the Lawyers' Committee for Human Rights, also testified on appellant's behalf.

Yet, the magistrate judge concluded that "[t]heir testimony was devoid of any facts from which [the court] could find that [the witnesses] have any means of monitoring [appellant's] whereabouts. Perhaps most significantly, nothing in the witnesses' testimony suggests that defendant would be amenable to supervision by any of them." The district court reiterated that finding, noting that "it is clear that if the accused chose to leave, [Ms. Porter and Sister Krommer] could not stop him." However, appellant's attorney proffered, and the district court accepted as

accurate, that appellant was "completely willing to comply with the conditions of release of the court, to work with the nun, Sister Pat Krommer, or Kathryn Porter, or whoever else the court would require to comply with the conditions of release and to return to court. He has no intentions of fleeing." In view of the immense harm to their reputations that Sister Krommer and Ms. Porter would suffer if appellant were to flee and appellant's proffer that he would comply with any conditions of release imposed upon him, the government failed to prove by a preponderance of the evidence that "no condition or combination of conditions" would "reasonably assure" appellant's appearance in court. 18 U.S.C. § 3142(e).

Finally, there is no outstanding deportation order against this appellant. Moreover, section 3142(d) has a specific provision for a ten-day temporary hold on a defendant who is not a citizen, during which time the government attorney is to notify the appropriate INS officials so that they may act against the appellant if they choose. 18 U.S.C. § 3142(d)(1)(B). After that time, "[i]f the official fails or declines to take the person into custody . . ., the person shall be treated in accordance with the other provisions of this section [3142], notwithstanding the applicability of other provisions of law. . . ." 18 U.S.C. § 3142(d)(2). When the government did not move here for temporary detention under section 3142(d), it does not seem legitimate for it to now introduce the specter of a possible deportation through the back door as a principal reason for detention.

We cannot but conclude that a serious error has been made here. A first-time offender accused of a nonviolent crime with strong community ties and respected members of that community willing to supervise his release in any manner the court finds necessary, including designated residences, curfews, reporting in, is incarcerated pending trial, despite the fact that his entire lifestyle and mission strongly suggest he will stay in place, and his charged misdeed (if, indeed, he is found guilty) was to falsify information on a passport in order to remain in this country.[2] The pretrial detention provisions of the Bail Reform Act of 1984 were not intended to apply to such an appellant. The magistrate judge and district court referred several times to the notion that if the defendant were to flee, his supervisors could not stop him. That, of course, is true of every defendant released on conditions; it is also not the standard authorized by law for determining whether pretrial detention is appropriate. Section 3142 speaks of conditions that will "reasonably" assure appearance, not guarantee it. See also H.REP. No. 1030, 98th Cong., 2d Sess. 15 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3198 (acknowledging feasibility of conditions even "where there is a substantial risk of flight"). The record here contains more than enough to satisfy the "reasonable" assurance test, and not enough to show by a preponderance of the evidence that no combination of conditions will assure the defendant's appearance.

Thus, despite the large discretion normally accorded the trial court in this area, we revoke the order of detention.[3]

GINSBURG, Circuit Judge, dissenting:

The defendant stands charged with making a false statement on a passport application in violation of 18 U.S.C. § 1542. According to the testimony of a Special Agent of the Department of State Security Service, in 1986 the defendant procured a passport in the name of a deceased person, Steven Barry Citron. In 1988, based upon a court document attesting to a change of name, he was issued a new passport, this time in the name of Sereno Citron. In 1993 he obtained yet another passport, this time in the name of

---

**2.** He subsequently made two name changes as to which he notified the passport authorities—the last one being a politically significant appellation comparable to Malcolm X or David Ben Gurion, names adopted by mission-oriented leaders of other cultures.

**3.** We recognize that appellant is currently being held in the Central District of California. Counsel for the government has advised us that a pretrial hearing is scheduled for Wednesday, May 15, 1996. We therefore revoke the district court's detention order entirely rather than remanding for further proceedings, since another hearing in the District Court for the District of Columbia would simply interfere with the California proceedings.

Kani Xulam, again based upon a purported change of name. During a search of defendant's office, agents recovered a Turkish passport with a photograph of defendant and a Canadian social security card, both in the name of Namet Gunduez.

Because the defendant is apparently subject to deportation as an illegal alien—the INS has instituted an investigation and lodged a detainer against him—and has a demonstrated ability to obtain false travel and other documents, the Government suggested that the risk he would flee is sufficiently high that he should be detained pending trial, pursuant to 18 U.S.C. § 3142. The district court held a hearing at which the defendant made the best record he could in support of the proposition that he should be released into the custody of certain respected citizens willing to serve in that capacity. The court then granted the Government's detention request on the ground that "no condition or combination of conditions" of release could reasonably assure that the defendant would appear as required for future hearings.

As for the testimony of the two witnesses who offered to supervise defendant's release, the district judge explained at some length why he considered their offers inadequate to assure the defendant's appearance. Basically, having first concluded that the defendant is likely to flee, the court found that "those persons . . . could not stop him."

Moreover, the Magistrate Judge who compiled the record upon which the district court acted—and who had also concluded that no condition or combination of conditions of release would be adequate—made the following findings of fact. (1) Both of the persons who offered to assume custody of the defendant, and the third witness who testified in opposition to his detention, have "an acquaintance [with him] which is superficial." They did not know "his name, other names he has used, where he is from and where his family is . . . ." Nor did they know his immigration status. (2) "[N]othing in the witnesses' testimony suggests that defendant would be amenable to supervision by any of them."

Nonetheless, the Court of Appeals, which has no firsthand knowledge of the defendant or of his witnesses, revokes the district court's order of detention. Do my colleagues know something that the district court does not? Yes: They know that this "international human rights worker" and advocate for the Kurds of Turkey, who might be deported to Turkey where, he claims, he would be persecuted, would not, if released pending trial, flee in pursuit of personal safety and the opportunity to continue his human rights work from another capitol, because that would do "immense harm to [the] reputation" of the two acquaintances who vouchsafed his appearance. This is nothing more than a leap of faith on the part of my colleagues.

The court devotes most of its opinion to the claim that the district court could have devised "some combination of conditions" calibrated reasonably to assure that the defendant would not flee—another leap of faith, it seems, for the defendant proposed no such combination of conditions, the district court concluded none exists, and the Court of Appeals itself is silent upon what that combination might be. In any event, having made that argument, the court then revokes the detention order *unconditionally,* thereby conferring upon the defendant more relief than the court has tried to justify and indeed more than the defendant has requested. The defendant at least proposed that he be released into the custody of one of his two acquaintances. By omission, the court has rejected even that slight concession by the defendant to the concerns expressed not only by the Government but by the magistrate and the district judge as well.

The court explains its decision to "revoke the district court's detention order entirely rather than remanding for further proceedings" as an effort to avoid interfering with proceedings now pending in California. Releasing the defendant to the custody of his sponsors, however, as he proposed, would not interfere with the California proceedings at all. Moreover, the court's apparent complacency about the Government's ability to retain custody of the defendant in California is unwarranted. First, the California hearing has already been stayed once, and we have no way of knowing when it will be completed; in the interim the defendant could, he argues, be released on the ground that the

detainer has expired. Second, the inclination of the INS to pursue the defendant's deportation is entirely irrelevant to our responsibility to assure that the defendant does not flee in contemplation of his possible deportation. Third, the district court expressly deferred to the judgment of the California magistrate; even if we were to affirm the district court, therefore, the Government would still be obliged to make its case in yet another forum or, if necessary, to invoke whatever detention arrangements are permitted under the deportation provisions of the Immigration and Naturalization Act.

Why my colleagues take it upon themselves to become advocates for the defendant—who is zealously represented by counsel of his own—is a mystery to me. One thing is clear, though: In view of the record, the district court was well within what the court acknowledges is "the large discretion normally accorded the trial court in this area."