**UNITED STATES of America,**

v.

**Timothy Louis HUDSPETH, et al., Defendants.**

**No. CRIM 01–0143–02 HHK.**

United States District Court, District of Columbia.

June 19, 2001.

Diane Stewart Lepley, Washington, DC, for Defendant.

## MEMORANDUM

KENNEDY, District Judge.

Timothy Hudspeth and others are charged in a one count indictment with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. On May 9, 2001, the United States moved to have Hudspeth detained without bond pursuant to 18 U.S.C. § 3142(e). Following a lengthy hearing, Magistrate Judge Deborah Robinson denied the United States' motion. Applying well-established principles of law and taking into account a rebuttable presumption that no condition or combination of conditions of release would reasonably assure the safety of the community should Hudspeth not be detained, Magistrate Judge Robinson concluded that the United States had not carried its burden of showing that pretrial detention was warranted. By oral motion, the United States immediately moved to have this court review and revoke Magistrate Judge Robinson's release order. The motion of the United States was denied in an oral ruling made from the bench. This memorandum addresses important issues implicated by the United States' effort to have Hudspeth detained [1] and sets forth the rationale for the court's decision.

### I.

On April 24, 2001, Hudspeth and codefendants William Handy, Christopher Hall, Donald Goodman, and Michael Zorn were indicted on one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. The Government proffers that these men participated in a scheme to transport large quantities of cocaine from California to the Washington, D.C. area. It is alleged that since February, 2001, they made four such shipments, with the fourth containing 39 kilograms of cocaine powder. The United States contends that defendants concealed the cocaine shipments by transporting them with skin care merchandise from a

---

1. The Assistant United States Attorney who argued the Government's position before this court explained that the procedure that was followed in this case is the one customarily employed when the Government seeks to have a Magistrate Judge's release order reviewed and revoked. Most often, and unlike in this case, such an attempt comes when a Magistrate Judge has entered a release order prior to indictment. In such cases, the Government's motion is heard by the Chief Judge of this court.

front company called Skin Tight Products ("Skin Tight"). William Handy owns and operates Skin Tight, while Hudspeth serves as its director of marketing. The United States further proffers that Handy and Hudspeth used one of Skin Tight's vans, a blue Toyota Previa, a vehicle fitted with a secret compartment, to transport the cocaine across country.

Based on surveillance video and intercepted telephone calls, the Government submits that Handy drove the Previa van to Hudspeth's home in Compton, California, where it was loaded with 39 kilograms of cocaine hidden in the van's secret compartment, along with 50 to 150 bottles of Skin Tight merchandise. About a day and a half later, Donald Goodman and Michael Zorn drove the van from Hudspeth's home in California to the Washington, D.C. area. The Government proffers that Hudspeth was in regular phone contact with Goodman and Zorn during the trip and that he monitored their progress across the country.

Once the van arrived in the Washington, D.C. area, Handy and Hudspeth flew from California to meet up with the van. But before Handy and Hudspeth arrived at the meeting location, police authorities in Frederick, Maryland stopped and searched the van, discovering the 39 kilograms of cocaine powder hidden in the van's secret compartment. Zorn and Goodman were placed under arrest. Later, a police officer posing as Zorn called Handy to indicate that Goodman had been arrested for a minor traffic offense, but that he (the police officer disguised as Zorn) had possession of the van and its contents. Zorn indicated that he could not complete the drop off and that Handy and Hudspeth should travel to Frederick, Maryland to get the van. Handy and Hudspeth drove together to pick up the van, but were later arrested by police authorities. After the arrests, police officials executed a search warrant at Hudspeth's Compton, California home. Authorities seized $2,200 in cash, a heat sealer, a digital scale, plastic bags, and two glass beakers. The officers also found cocaine residue in the glass beakers.

Following a two-hour detention hearing, Magistrate Judge Robinson concluded that "the Government had not carried its burden of proving by clear and convincing evidence, even with the aid of the presumption, that no condition or combination of conditions would reasonably assure the safety of the community" if Hudspeth were released pending trial. Transcript of Detention Hearing before Magistrate Judge Robinson at 80 (D.D.C. May 14, 2001) ("Hearing Transcript"). In lieu of detention, Magistrate Judge Robinson released Hudspeth on a $25,000 unsecured appearance bond and ordered that he be placed on electronic monitoring to be supervised by the United States Probation Office in Los Angeles. Magistrate Judge Robinson also set specific restrictions on Hudspeth's travels.

Upon the oral request of an Assistant United States Attorney, this court set a date and time for a hearing on the United States' motion for review of the Magistrate Judge's release decision, and Magistrate Judge Robinson stayed her order releasing Hudspeth until this court's decision on the United States' review motion.

## II.

### A. Proper Procedure

█ The United States' effort to have Magistrate Judge Robinson's release order reviewed and revoked raises two important issues that merit a written response from this court. The first issue is the procedure the Government must follow if it wishes to have a District Judge review a Magistrate

Judge's order releasing an accused pending trial. Fortunately, the court need not write on a clean slate for the Bail Reform Act, 18 U.S.C. § 3145, clearly sets forth the procedure to be followed. In pertinent part, the Bail Reform Act states:

> (a) **Review of a release order.**—If a person is ordered released by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense ...
>
> (1) the attorney for the Government **may file,** with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release;
>
> &ast; &ast; &ast; &ast;
>
> The motion shall be determined promptly.

18 U.S.C. § 3145(a) (emphasis supplied).

It is readily apparent that in order to have a District Judge review a Magistrate Judge's decision the Government must **"file ... a motion"** asking for review. *Id.* (emphasis added). Necessarily, the requirement that a motion be filed means that the motion must be in writing and, like other motions, must be served on the attorney for the defendant. The procedure followed in this case was not proper. No motion for review was filed. Instead, an Assistant United States Attorney merely called the court's staff to request a date and time for the court to hear the government's objection to the Magistrate Judge's release order. This request should have been denied.

The court appreciates that the requirement for a motion to be filed when the Government seeks review of a Magistrate Judge's release order may mean that an accused will be released pending a resolution of the Government's request for review. Such an outcome does not warrant disregarding the plain requirements of the governing law, however. In this regard, it is useful to consider that it has never been questioned that in order for a defendant to have a District Judge review a Magistrate Judge's pretrial detention order he must file a written motion.[2] Nor has there been any question of the appropriateness of the accused remaining detained until there is a resolution of the defendant's motion. This court is unaware of any legal principle or logic that accords the Government's position regarding whether a defendant should be released pending trial a standing superior to that of the defendant such that the Government's position, as a matter of course, is effectively adopted—albeit temporarily—even after a judicial officer has ruled otherwise. The illogic of this proposition is further underscored when one considers that it is the Government that carries the burden of showing that an accused should be detained pending trial.

### B. Standard of Review

The second issue raised by the government's effort to have the Magistrate Judge's release order in this case reviewed and revoked is the appropriate standard of review a District Judge should apply when reviewing such an order. Apparently, this

---

2. The requirement that a defendant file a motion to seek a review of an order of detention—like the requirement for the Government to file a motion to seek a review of an order of release—is set forth in the Bail Reform Act. The relevant provisions provide in pertinent part:

> (b) **Review of a detention order.**—If a person is ordered detained by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense ..., the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

18 U.S.C. § 3145(b).

is a matter of first impression in this judicial district. At the hearing on the government's review request, this court stated that it was persuaded by Judge Walker's analysis in *United States v. Harris,* 732 F.Supp. 1027, 1032 (N.D.Cal.1990). Judge Walker held that the appropriate standard to employ when reviewing a Magistrate Judge's release or detention decision was "somewhere between *de novo* and appellate review." *Id.* at 1033 (internal quotations omitted). Judge Walker stated that District Judges should give appropriate deference to a Magistrate Judge's factual findings, absent a showing that they were clearly erroneous, but also make an independent assessment of the facts as established by the record. *See id.* at 1032–33. This court agreed with Judge Walker that such a middle-ground approach favors judicial economy and respects the authority specifically delegated to magistrate judges to make decisions regarding whether an accused should be released or detained pending trial.

While the court continues to believe that Judge Walker's analysis is well reasoned, subsequent research on the issue reveals that his view has been rejected by the Ninth Circuit in *United States v. Koenig,* 912 F.2d 1190, 1191 (9th Cir.1990). Holding that the standard of review announced by Judge Walker in *Harris* was in error, the Ninth Circuit adopted the reasoning of the Fifth Circuit in *United States v. Thibodeaux,* 663 F.2d 520, 522 (5th Cir.1981). The Fifth Circuit stated:

> The statutory scheme adopted in [18 U.S.C. § 3145] confers a responsibility on the district court to reconsider the conditions of release fixed by another judicial officer under [18 U.S.C. § 3142] as unfettered as it would be if the district court were considering whether to amend his own action. He is not constrained to look for abuse of discretion or to defer to the judgment of the prior judicial officer. These latter consider-

ations would be pertinent when, under section [§ 3145(c)], the district court's action is called before the court of appeals.

*Thibodeaux,* 663 F.2d at 522.

The *Koenig* court found no "flaw in this reasoning" and determined that the *Thibodeaux* standard was the "equivalent of 'de novo.'" *Koenig,* 912 F.2d at 1191–92. The Ninth Circuit in *Koenig* also pointed out that a de novo standard had also been endorsed by other circuits that had considered the issue. *See id.* (citing *United States v. King,* 849 F.2d 485, 491 (11th Cir.1988); *United States v. Maull,* 773 F.2d 1479, 1481 (8th Cir.1985) (en banc)). This court's own research has also uncovered the following cases: *United States v. Rueben,* 974 F.2d 580, 585–86 (5th Cir. 1992) (holding that the district court reviews the magistrate judge's pretrial detention orders de novo), *cert. denied,* 507 U.S. 940, 113 S.Ct. 1336, 122 L.Ed.2d 720 (1993); *United States v. Tortora,* 922 F.2d 880, 884 n. 4 (1st Cir.1990) (same); *United States v. Clark,* 865 F.2d 1433, 1437 (4th Cir.1989) (same).

As has been mentioned, neither the United States Court of Appeals for this Circuit nor any other court in this jurisdiction has ruled on the issue of the proper standard for reviewing a Magistrate Judge's decision regarding a defendant's release or detention pending trial. The court need not dwell on the issue further, however, because even if the de novo standard of review advocated by the Government is employed, this court has determined that Magistrate Judge Robinson's decision releasing Mr. Hudspeth should not be revoked.

█ Determinations regarding pretrial detention are governed by provisions of the Bail Reform Act. *See* 18 U.S.C. § 3142 *et seq.* Section 3142(b) states that a person charged with an offense **shall be released** on his personal recognizance or an

unsecured appearance bond, **unless** the court determines that "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." *Id.* If a person is charged with certain crimes, including drug offenses that carry a maximum term of imprisonment of ten years or more (the case here), the statute provides a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of the community. *See* 18 U.S.C. § 3142(e). Still, the court must evaluate various factors to determine whether conditions of release could be imposed that would reasonably assure a defendant's presence and not leave the community at risk. These factors include (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g). Of course, the United States bears the burden of showing, by a preponderance of the evidence, that a defendant poses a flight risk and, by clear and convincing evidence, that a defendant poses a danger to the community. *See* 18 U.S.C. § 3142(f); *United States v. Xulam*, 84 F.3d 441, 442 (D.C.Cir.1996).

■ Except for the rebuttable presumption required by § 3142(e) and arguably the weight of the evidence against Hudspeth, the factors the court has considered in determining whether to detain Hudspeth do not weigh in favor of detention. Indeed, Hudspeth's personal history and personal characteristics weigh strongly in favor of pretrial release. There is no evidence that Hudspeth has ever been convicted of a crime.[3] He lives at home with and cares for his elderly mother. And various letters submitted to the court indicate that he is constructively involved with his community and supports his 14–year–old son, who lives in the Washington, D.C. area, a circumstance which connects him to this jurisdiction.

As for the weight of the evidence of guilt, the factor upon which the Magistrate Judge and the Government focused, the court concludes that the evidence, while substantial, is not compelling.[4] There is no direct evidence tying Hudspeth to a transcontinental drug conspiracy in general and to the 39 kilograms of seized cocaine in particular. There is no evidence that Hudspeth packed the van with cocaine or knew that it was present in the van. Although the FBI intercepted approximately 2,700 telephone calls during its investigation of this case, only 200 or so were deemed relevant to this case, and of those 200, only "two or three" included a voice believed to be that of Hudspeth. *See* Hearing Transcript at 23.

Simply put, when all pertinent matters are put on the scale, there is no clear and convincing showing that there is no condition or combination of conditions of release that would reasonably assure the safety of the community should Hudspeth remain released.[5] Indeed, the court concludes that the conditions imposed by Magistrate Judge Robinson are adequate for this purpose.

---

**3.** Pretrial Services did indicate that Hudspeth was charged in 1984 with possession of a narcotic controlled substance, but the disposition of that case is unknown.

**4.** This determination is based on the record as of the time of the court's hearing.

**5.** The Government did not argue that Hudspeth poses a risk of flight.