COLLEEN KOLLAR-KOTELLY, United States District Judge
This matter comes before the Court on Defendant Harry Meir Mimoun Amar's [44] Motion for Pretrial Release. A federal grand jury in the District of Columbia has returned an Indictment charging Defendant Amar and three other individuals with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349. Defendant was arrested last year in Israel by Israeli law enforcement. He is a dual citizen of Israel and Morocco. After fighting against his extradition for seven months, Defendant conceded to extradition and was brought to this country. On November 16, 2017, the United States Department of Homeland Security ("DHS") served a detainer for the Defendant, noting Defendant's status as a removable alien and that the DHS would assume custody of Defendant if he is released by law enforcement.
Defendant initially consented to detention without prejudice before Magistrate *288 Judge G. Michael Harvey, but has now moved to be released pending his trial pursuant to 18 U.S.C. § 3142. Defendant argues that he does not pose a serious risk of flight, has no prior criminal record, has consented to extradition, has roots in the United States, and has a strong potential defense in this case and thus an incentive to appear before the Court. Defendant represents that he is prepared to sign a bond of $2,000,000 and abide by conditions of release including home confinement, electronic monitoring, regular reporting to Pretrial Services, and a consent to being extradited (again, if necessary) from Israel. The Court held a hearing on Defendant's motion on January 5, 2018.[1]
The Bail Reform Act provides that a defendant may be detained if the district court finds by clear and convincing evidence "that no condition or combination of conditions will reasonably assure the safety of any other person and the community ...." 18 U.S.C. § 3142(f). Further, a defendant may be detained under the Act if the district court finds by a preponderance of the evidence "that no combination of conditions-either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful-can 'reasonably' assure that the defendant will appear for trial." United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996) (per curiam). The district court examines the following factors in making its determination on pretrial release: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).
The Court finds by a preponderance of the evidence that Defendant poses a serious risk of flight and no combination of conditions will reasonably assure that Defendant will appear for trial if released.[2] The Court's conclusion is based primarily on three factors. First, although not a crime involving violence or drugs, the offense Defendant is charged with is a very serious one, involving a sophisticated fraud, the falsification of documents, use of false identities, and international safe houses. Defendant and three other alleged co-conspirators are charged with operating a cyberfraud scheme known as a "business email compromise" or "BEC" scheme. According to the Superseding Indictment, Defendant and his alleged co-conspirators would send fraudulent e-mails to mid-level employees at companies, pretending to be high-ranking officials of those companies. Defendants would, allegedly, convince the employees they contacted to move massive sums of money into bank accounts that the Defendants controlled. The charges in the Superseding Indictment involve the alleged defrauding of several companies of over $10 million Euros.
The Court understands that Defendant disputes his role in some of the acts described in the Superseding Indictment, but this argument does not convince the Court that release is appropriate. As an initial matter, given that Defendant is alleged to have engaged in a conspiracy, he may very well be held responsible for all of the acts taken in furtherance of the charged conspiracy, regardless of his direct involvement.
*289 Moreover, it is not as though the role the Superseding Indictment describes Defendant as having played in the conspiracy was a minor one. According to the Government, in addition to personally engaging in the BEC scheme, Defendant also masterminded that scheme, providing a template for this type of fraud to his co-conspirators. Regardless, even if limited to the acts Defendant is directly tied to in the Superseding Indictment, Defendant is still being charged with fraud of over $1 million Euro. Similarly, although the Court understands that Defendant disputes the application of the sentencing guidelines to his role in the alleged conspiracy, if convicted, Defendant could potentially be sentenced to a lengthy prison term. The statutory maximum period of incarceration is twenty years.[3] The seriousness of the charged offense makes it more likely that Defendant would attempt to flee prosecution.
Second, based on the proffer of the Government at this early stage, the evidence against Defendant-including the testimony of as many as five Government cooperators that Defendant taught them how to conduct the alleged fraud, corroborating testimony from the victims of the fraud, and recorded conversations-appears significant. The Court understands that Defendant disputes this evidence, but at this point the Court is persuaded that the Government has considerable evidence against Defendant. This too makes Defendant more of a flight risk.[4]
Third, the history and characteristics of the Defendant himself suggest that he is a flight risk and that no conditions will reasonably ensure his presence at trial. Defendant is, allegedly, the mastermind of an international cyber fraud scheme. Specifically, as described above, Defendant is charged with conspiring in a sophisticated multinational scheme of deception that involved evading law enforcement and establishing safe houses in various different countries (including Bulgaria, the country in which overt acts Defendant specifically, allegedly, committed occurred). Defendant allegedly speaks a number of different languages, which would increase the number of possible destinations to which he could flee. Based on the Superseding Indictment and the representations of the Government, Defendant may also have access to funds overseas.
Defendant is also not a citizen of the United States. One of the countries of which Defendant is a citizen-Morocco-has no extradition treaty with the United States, providing Defendant with a plausible destination to which to flee. Defendant has considerable ties to Morocco, including that his brother and parents live there. Although Defendant argues that if he fled to Morocco he could be prosecuted in that country for his alleged crimes, the Court finds this possibility highly speculative and not a convincing assurance that Defendant would not attempt to flee to that country.
*290 Defendant is also a citizen of Israel. Defendant offers to make certain assurances that he would consent to extradition if he fled to Israel, but the Court's consideration of those assurances is colored by the fact that the last time he was in Israel Defendant fought his extradition for nearly seven months, and consented only after receiving two adverse court rulings. As Defendant concedes, it is also not clear whether the consent to extradition Defendant offers to sign would actually be enforceable in Israel. The Government represents that the United States Department of Justice, Office of International Affairs, is unaware of any country that would consider an anticipatory waiver of extradition as binding in its extradition proceeding. See Gov.'s Sur-Reply, ECF No. 48, at 5.
Not only is Defendant not a citizen of the United States-which does not automatically disqualify an individual for pretrial release-Defendant's connection to this country is quite weak. He has no legal status at all here and, unlike in many cases cited in Defendant's briefs, he has not been living or working in this country. The Court is aware of no business, property or other similar types of connections Defendant has with the United States. The only real connection Defendant appears to have to this country is that some of his relatives are apparently living here. But even these familial connections do not appear to be particularly strong. The family members that reside in the United States are, like Defendant, not U.S. citizens. They are permanent resident aliens or are here on a student visa. The Court understands that these individuals are Defendant's siblings, but Defendant does not represent that he visits them frequently or otherwise has close connections with them that would meaningfully connect Defendant himself to the United States. Moreover, although Defendant has siblings in this country, Defendant's wife and children reside in Israel.
At the hearing the Court held on Defendant's motion for pre-trial release, Defendant raised the possibility that the Government could prevent him from fleeing to Morocco, Israel or other international destinations by proactively issuing an order under 8 C.F.R. § 215.2 which would, in theory, prevent Defendant from leaving this country. The Court ordered both parties to brief this issue. In summary form, as the Court now understands it, this regulation would allow the government to add Defendant's name to a database that could be referenced by U.S. Customs and Border Protection ("CBP") in the event Defendant attempted to leave the country at certain border crossings and by certain modes of transportation. If Defendant attempted to leave, and CBP found his name in this database, Defendant could then, presumably, be taken into custody. It is important to note that this is a biographic information-based system, not a biometric one. In other words, an individual leaving the country is identified based on personal identifying information on whatever travel documents are presented, not based on any of the individuals' unique traits, such as their fingerprints. This system also does not include all modes of departure, and there are apparently no routine departure operations at land border crossings.
The Court is not convinced that this would solve the problem of Defendant's flight risk. The Government represents that, as a practical matter, 8 C.F.R. 215.2 would not be sufficient to prevent Defendant from leaving the country given the lack of biometric checkpoints at the border and the fact that there are no or limited outbound controls for various modes of departure. On the particular facts of this case, where Defendant is charged with fraud involving falsifying documents, taking on false identities and avoiding detection by law enforcement by setting up *291 international safe houses, the Court shares the Government's concerns.[5]
Finally, although the conditions of release to which Defendant is willing to consent are significant, they are not enough to overcome the Court's conclusion that Defendant would flee. Defendant proposes a $2,000,000 bond, but the Court has no information about Defendant's finances and accordingly is not in a position to know whether $2,000,000 is a significant sum to Defendant or his relatives. See United States v. Patriarca , 948 F.2d 789, 795 (1st Cir. 1991) (holding that without information about a defendant's assets or net worth, the court "fail[s] to see how a judicial officer could arrive at a forfeiture amount which would reasonably assure compliance"). Moreover, Defendant proposes to secure this bond with the properties of others-none of the properties that Defendant offers as security for the proposed $2,000,000 bond actually belong to him. Defendant would not be risking his own money or property. The Court's review of the relevant case law suggests that in the majority of instances-though not all-where property is used to secure a defendant's release, the property actually belongs to the defendant. The Court has no information suggesting that Defendant could not put up a bond with his own resources. Nor has the Court been provided meaningful information about Defendant's relationship with the siblings who own the properties that would be secured by the bond such that it could assess the effectiveness of a bond secured by their property at persuading Defendant not to flee.
With respect to GPS monitoring, although such monitoring is effective at tracking Defendant's movements, it would not prevent a sophisticated individual like Defendant from fleeing. The parties dispute how GPS monitoring of the Defendant while on courtesy supervision by Pretrial Services in New Jersey would work in practice. The Court has conducted its own investigation and learned the following directly from Pretrial Services: If a defendant under courtesy supervision in New Jersey were to leave his confinement after hours or over the weekend, a third party company who monitors his location around the clock would first have to notify New Jersey Pretrial Services, who have an individual assigned on a 24 hours basis. New Jersey Pretrial Services would then attempt to contact District of Columbia Pretrial Services to inform them that Defendant was out of compliance. District of Columbia Pretrial Services does not have after hours or weekend coverage, and accordingly would only learn of Defendant's violation on the next business day. They would then ask this Court for a warrant for Defendant's arrest. Once the Court issued that warrant, the United States Marshals would then attempt to find the Defendant and arrest him. Needless to say, this system would not prevent a motivated and sophisticated individual residing in New Jersey from fleeing.[6] This is also *292 not a case where the FBI would be supervising Defendant during his release. Gov.'s Sur-Reply at 10. The Court shares the Government's concern that despite the conditions of release Defendant has consented to, Defendant would be able to flee from his sister's residence in New Jersey. Again, the Court's concern about Defendant's willingness and ability to flee, and the weight that it gives to Defendant's assurances that he would not flee, are also informed by the fact that Defendant is charged with a crime involving the use of deception and sophisticated fraud.
Because he faces very serious charges and a seemingly strong Government case, and because he does not have strong ties to this country, is a citizen of a country without an extradition treaty with this country, is an alleged mastermind fraudster, and has fought extradition in the past, the Court concludes that no combination of conditions can reasonably assure that Defendant will appear for trial if released. The Court will accordingly deny Defendant's motion for pretrial release.
The Court's decision is not based on the Government's representation that if the Court were to order Defendant released under the Bail Reform Act, DHS would detain Defendant and initiate expedited removal proceedings. Defendant has cited a number of cases from other jurisdictions suggesting that it is legally problematic for a variety of reasons for DHS to hold a defendant pending trial if a court has ordered the defendant's release under the Bail Reform Act. Under the reasoning of these cases, a court should not consider a Defendant's potential deportation or administrative detention for the purposes of its Bail Reform Act analysis.
It is not clear that these cases apply here, where the Government represents that the Defendant would not be held pending his trial by DHS, but instead would be immediately deported. That being said, the Court need not and does not resolve that issue. Even if the Court agreed with the cases cited by Defendant, it would not affect the outcome of Defendant's motion. As set forth above, the Court concludes that Defendant should be detained for reasons separate and apart from the DHS detainer and Defendant's potential deportation. The Court's decision to detain Defendant does not rely on those factors.
SO ORDERED.

Defendant's [49] Motion for Leave to File a Supplemental Reply is GRANTED. In reaching the conclusions set forth in this Order, the Court has considered Defendant's Supplemental Reply.

The Court notes that Pretrial Services similarly concluded that no combination of conditions would reasonably assure Defendant's appearance at trial.

The Government represents that Germany is also investigating Defendant for frauds not charged in this case and may seek to prosecute him after this case is completed.

Without ruling definitively on the merits of Defendant's proffered extraterritoriality defense-which it cannot do at this early stage of the case before having received significant legal briefing or argument-the Court notes that it is not convinced that this argument is of such obvious merit that Defendant would have no incentive to flee prosecution. Apparently Defendant has presented this argument to two Israeli courts-one that decided to detain Defendant pending a decision on his extradition, and another appellate court that affirmed that decision-and neither have been sufficiently persuaded by the argument to grant Defendant's release. See Gov.'s Sur-Reply at 1. The Court, of course, by no means suggests that it agrees with or is bound by the Israeli courts' analysis.

Defendant also has briefly mentioned the possibility that the Government could obtain an INTERPOL Green Notice for Defendant, which could prevent Canada or Mexico from allowing Defendant entry into their countries. See Def.'s Resp. in Further Support of His Motion for Pretrial Release, ECF No. 52. ("Def.'s Resp."), at 4. This plan appears to suffer from the same practical issues that make the Court unwilling to rely on 8 C.F.R. § 215.2 to prevent Defendant from fleeing.

The Court's conclusion is not altered by Defendant's argument in his latest pleading that "the Pretrial Services agency for the District of New Jersey is prepared to directly and immediately notify Your Honor ... if Mr. Amar were to violate any condition of his release." Def.'s Resp. at 5. Even if this could be arranged, the procedure for intervening in any attempt by Defendant to flee would still be quite slow.