**UNITED STATES of America**

v.

**Gregory SCARPA, Sr., Defendant.**

**No. CR 93–124.**

United States District Court,
E.D. New York.

Feb. 23, 1993.

Supplementing Order March 5, 1993.

Mary Jo White, U.S. Atty., by Andrew Weissmann, Brooklyn, NY.

Joseph Benfante, New York City, for defendant.

**AMENDED MEMORANDUM
AND ORDER**

WEINSTEIN, District Judge.

According to his treating physician Defendant Gregory Scarpa, Sr. is terminally ill with AIDS. Observed in court, his skeletal-like frame, shuffling gait, AIDS-related dementia and scab-covered face confirm this diagnosis. He will shortly die, never to be tried for his alleged heinous crimes as a murderous mafia captain.

Defendant is presently at the Metropolitan Correctional Center (MCC) in Manhattan awaiting trial on charges of racketeering, racketeering conspiracy, murders, conspiracy to murder and carrying and using a firearm in connection with a violent crime. He suffers from several grave medical problems; his treating physician concludes that he has entered the final stages of this fatal illness. Because he can receive necessary and humane treatment only under the care of his physician, an AIDS specialist, at a hospital, he is granted bail on condition that he be confined to Beekman Hospital under the 24–hour guard of the United States Marshal's Service at his own expense. A copy of the order is attached as Exhibit A.

## I. FACTS

Defendant was arrested on August 31, 1992 and charged with conspiracy to murder and carrying and using a firearm in connection with a violent crime. 18 U.S.C. §§ 924(c) and 1959(a). After holding a detention hearing, Magistrate Judge John L. Caden determined that defendant was a danger to the community "based on the nature of the charges against him and evidence proffered by the government at the hearing concerning the defendant's prior violent acts." Defendant was nonetheless released on September 16, 1992 because Magistrate Judge Caden found that conditions were available that would "reasonably assure the appearance of the defendant and the safety of the community." *See* 18 U.S.C. § 3142.

The factors Magistrate Judge Caden relied upon included the inability of the local prison system to meet defendant's medical needs, the small probability of defendant living long enough to stand trial, and the restrictive terms of his house arrest which, in connection with his medical condition, would effectively incapacitate defendant to the same extent as incarceration. He specifically found that defendant "will eventually contract an infection which will prove to be fatal, either in or out of prison" and that "the defendant faces an unacceptably high risk of infection and death on a daily basis inside the MCC." The conditions of defendant's release included posting a bond of $1.2 million of equity, that he not leave his home except for necessary medical treatment, that he subject himself to monitoring by wearing an electronic bracelet at all times and that he not communicate with persons designated in a list submitted by the government.

Between 12:01 a.m. and 12:11 a.m. on December 29, 1992, defendant made an unauthorized exit from his house. While he was outside his home, an exchange of gunfire occurred, the details of which are not known. Defendant sustained a gunshot wound that resulted in the loss of one eye. The government recovered evidence of defendant's continuing loansharking activity subsequent to his release on bail. Based upon a finding that there was clear and convincing evidence that he violated the terms of his home detention, Magistrate Judge Caden revoked defendant's bail on January 14, 1993. Defendant was remanded to the MCC.

Defendant was subsequently indicted for racketeering, racketeering conspiracy and three murders, in addition to the murder conspiracy and the firearm offense for which he had originally been charged. He was arraigned on February 18, 1993. He pleaded not guilty and reapplied for bail. He offered the testimony of his doctor, who is an AIDS specialist at Mt. Sinai Hospital and who has been treating defendant since 1990. The government did not offer any medical testimony but relied on evidence before Magistrate Judge Caden that the MCC could provide adequate medical care.

The doctor's credible and unchallenged testimony established the following facts related to defendant's medical condition and care. A year ago defendant's T-cell count fell into the single digits, from which it was concluded that his life expectancy was measured in months. Defendant's condition has seriously deteriorated since he has been at the MCC. His life expectancy is now only a month or two. He has lost at least 25 pounds since entering the MCC and continues to lose weight rapidly in a cycle described as "AIDS wasting." The weight loss is exacerbated by the fact that defendant lost his stomach in 1986 as a result of a bleeding ulcer and requires a special diet and frequent feedings which the MCC cannot conveniently provide. It was tainted blood received during this operation that apparently was the source of his AIDS. The gunshot sustained by defendant destroyed his left eye and the surrounding area of his face and skull, leaving only soft tissue between his skin and brain. He has an infection on his face that threatens to spread to his brain. Intravenous antibiotics must immediately be administered. Defendant also has been suffering from AIDS-related dementia which has loosened his grip on reality. Defendant requires treatment in a hospital with AIDS specialists and access to his treating doctor.

Defendant had visible difficulty walking and standing at the arraignment. He has fallen on more than one occasion at the MCC and bled as a result—thus endangering fellow inmates who volunteer to assist him in moving about. He requires basic nursing care which is unavailable at the MCC. The prevalence of tuberculosis and flu viruses at the MCC gravely threatens defendant in view of his incapacitated immune system.

The MCC's medical facilities are minimal. Beekman Hospital has an ongoing arrangement with the MCC under which it treats

inmates who require hospital care. Defendant has once been treated there. The federal prison system has full hospital facilities for defendant only far from New York where neither defendant's family nor his physician would be able to attend to him.

Defendant's family attended the arraignment. They were visibly traumatized by defendant's shocking appearance and the prospect that he would continue to suffer a rapid decline in prison without humane care in the last days of his life.

## II. LAW

The United States Constitution places strict limits on the government's ability to imprison those who have been accused of crimes. A person charged with a crime is presumed innocent. *See Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951) ("Unless [the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.").

Punishment comes only after conviction by proof beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In limited circumstances, pretrial detention is permitted on a showing that the defendant poses a danger to the community or is likely to flee before a trial can be held. 18 U.S.C. § 3142; *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (pretrial detention on basis of future dangerousness is constitutionally permissible). Under our constitutional scheme, preventive detention has been and should remain the exceptional practice:

> [I]t is well to remember the magnitude of the injury that pretrial detention inflicts and the departure that it marks from ordinary forms of constitutional governance. Executive power to detain an individual is the hallmark of the totalitarian state. Under our Constitution the prohibition against excessive bail, the Due Process Clause of the Fifth Amendment, the presumption of innocence—indeed, the fundamental separation of powers among the Legislative, the Executive and the Judicial Branches of Government—all militate against the abhorrent practice. Our historical approach eschewing detention prior to trial reflect these concerns....

*United States v. Montalvo–Murillo,* 495 U.S. 711, 723–24, 110 S.Ct. 2072, 2080–81, 109 L.Ed.2d 720 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.) (footnotes omitted).

Even a presumptively innocent defendant who is legitimately found, pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.,* to pose a danger to the community cannot be incarcerated indefinitely pending trial. "[T]he due process limit on the duration of preventive detention 'requires assessment on a case-by-case basis, since due process does not necessarily set a bright line limit for length of pretrial confinement.'" *United States v. Gonzales Claudio,* 806 F.2d 334, 340 (2d Cir.), *cert. dismissed sub nom., Melendez–Carrion v. United States,* 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986) (quoting *United States v. Salerno,* 794 F.2d 64, 78–79 (2d Cir.1986) (Feinberg, C.J., dissenting), *rev'd,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).

The Court of Appeals for the Second Circuit recently identified several factors a court should consider in evaluating the permissible length of a particular pretrial detention to protect the community: "(i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of the trial; and (iii) the strength of the evidence upon which the detention was based...." *United States v. Orena,* 986 F.2d 628, 630 (2d Cir. 1993). Additional factors not adverted to by the Court of Appeals include: (iv) the defendant's medical condition; (v) the effect on his family while he is incarcerated; and (vi) conditions that can mitigate the dangers supporting detention.

In weighing these and other relevant factors, a court must not lose sight of the bed-

rock constitutional principles that lead us to American law's abhorrence of the imprisonment of presumptively innocent persons. As we celebrate the contributions of the late Justice Thurgood Marshall to our understanding of those principles, his words bear repeating:

> Honoring the presumption of innocence is often difficult; sometimes we must pay substantial social costs as a result of our commitment to the values we espouse. But at the end of the day the presumption of innocence protects the innocent; the shortcuts we take with those whom we believe to be guilty injure only those wrongfully accused and, ultimately, ourselves.
>
> Throughout the world today there are men, women, and children interned indefinitely, awaiting trials which may never come or which may be a mockery of the word, because their government believes them to be "dangerous." Our Constitution, whose construction began two centuries ago, can shelter us forever from the evils of such unchecked power.

*United States v. Salerno,* 481 U.S. 739, 767, 107 S.Ct. 2095, 2112, 95 L.Ed.2d 697 (1987) (Marshall, J., dissenting).

## III. APPLICATION OF LAW TO FACT

■ The length of this defendant's detention alone does not make it impermissible. He has been in jail for just over one month. *See United States v. Orena,* 986 F.2d 628, 630 (2d Cir.1993) (nine months not too long). The government is not responsible for any delay in bringing the case to trial. Magistrate Judge Caden's findings with respect to this defendant's dangerousness were unquestionably correct.

Three additional factors, in combination with the potential length of defendant's detention, however, require his release. His medical condition is without question grave and rapidly deteriorating. Immediate hospitalization is required. That the staff and inmates of the MCC cannot, despite their best intentions and efforts, humanely care for defendant's needs is readily apparent from his visible condition, the testimony of his doctor and the court's own knowledge of conditions at the MCC. In addition, defendant's family is suffering greatly from the knowledge that he is likely to die in pain and without the care of an adequate hospital staff and his own doctor. Finally, with no expense to the government the defendant can be guarded at all times by the United States Marshal's Service.

Defendant, subject as he is to the imminence of his own death, does not live by the same calendar as his fellow inmates. The continuation of detention for several additional months might be acceptable for the ordinary dangerous defendant who is preparing for a perhaps lengthy and complex trial at which guilt or innocence will be determined. For this defendant, however, each additional day in prison—awaiting a determination of guilt or innocence that is virtually certain never to occur—is a needless deprivation of his remaining life under conditions that, for him, are severely punitive. The effects on defendant's family of observing him suffer without adequate medical attention must also be considered.

Finally, defendant's dangerousness must be taken into account. There is no doubt that this defendant, in spite of his faltering health, would likely engage in further criminal activity if allowed to go free. Conditions are available, however, that permit defendant to be treated humanely while secured so that he poses no threat to the community. Assignment to Beekman Hospital will permit defendant to receive the care he requires, from both his own doctor and that hospital's knowledgeable staff. Continuous security will be provided by the United States Marshal's Service. Defendant's family has agreed to reimburse the government for the cost of this service and to pay defendant's medical expenses. He may not leave the hospital but he may have visits and telephone calls from those persons referred to in a list agreed to by defendant and the government. The Marshal's Service will have complete control over visits and calls.

Overriding principles of our system of justice require the conditional release of defendant despite his proven dangerous propensities. We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy. The fact that defendant may have been a cruel and vicious murderer without compassion for his victims does not permit the law to descend to his alleged level of depravity.

## IV. CONCLUSION

Defendant is released to Beekman Hospital upon the conditions set forth in this memorandum and the order attached as Exhibit A.

SO ORDERED.

### EXHIBIT A

United States District Court Eastern District of New York

United States of America

—against—

Gregory Scarpa, Sr., Defendant.

93 CR 0124.

Appearances:

Mary Jo White, United States Attorney

by: Andrew Weissmann, Assistant U.S. Attorney

225 Cadman Plaza East

Brooklyn, New York 11201

Joseph R. Benfante, Esq.

225 Broadway, Suite 2700

New York, New York 10007

### ORDER

IT IS HEREBY ORDERED THAT:

1. Upon the defendant's satisfaction of the conditions set forth below, the defendant shall be released from custody to Beekman Downtown Hospital in Manhattan (the "Hospital").

2. Defendant will be required to obtain a private room at the Hospital.

3. The defendant shall be guarded by the United States Marshal's Service twenty-four hours per day, seven days per week. At least two Marshals or other guards selected by the Marshal's Service shall guard the defendant at all times.

4. The cost of paying for the guards shall be borne entirely by the defendant and his family at the rate of $15.00 per hour, per guard. Payment for the guard service must be made in advance to the Marshal's Service each week and if it is not done, the defendant is to be remanded to the custody of the Metropolitan Correctional Center (the "MCC").

5. The cost of hospitalization shall be borne by the defendant and his family and any insurer that they may have.

6. The defendant shall be allowed personal visits by the doctors and medical staff of the Hospital, the defendant's treating physician Dr. Gumprecht, his attorney of record in this case and those members of his immediate family whose names appear on the attached list. No other people are to be allowed to visit or communicate with the defendant. Visitors are to present identification to establish their identity to the Marshal's Service.

7. The Marshal's Service will have the sole discretion to determine the frequency and length of visits as well as the number of people who may visit the defendant at any one time. They may search any visitor and must be present during all such visits. In particular, the Marshal's Service will carefully monitor any visits or communications with Frank Scarpa and Joseph Schiro. All visitors must disclose to the guards any items that they are bringing in to the defendant.

8. The above-mentioned visitors may go directly to the Hospital without first going to the Marshal's office in the Eastern District of New York to obtain an individual pass.

9. The defendant is not to have access to or possession of any firearms. If any visitor brings a firearm or any other weapon to the Hospital, the defendant shall be immediately remanded by the Marshal's Service to the MCC.

10. The defendant will be allowed one phone call per day, which may only be made to the people referred to in paragraph 6, above. However, during business hours, he may also make telephone calls to his attorney of record in this case.

11. The defendant will not otherwise have access to a telephone and no telephones will be present in the defendant's room other than when needed to make the calls noted in paragraph 10, above.

12. The Marshal's Service is to monitor all telephone calls.

13. The defendant is not to discuss any criminal activity on the telephone or with any visitor.

14. If the defendant is not admitted to the Hospital or is discharged from the Hospital at any time, he is to be remanded directly to the MCC by the Marshal's Service.

15. The defendant is not to leave the Hospital for any reason except for court appearances. The defendant shall be transported to court appearances by the Marshal's Service in the manner it deems appropriate. Marshals are authorized to use handcuffs and other security devices at any time.

16. The Marshal's Service shall immediately remand the defendant to the MCC if in its sole judgment any of the conditions of his release are violated. Specifically, and without limitation, if the defendant attempts to leave the Hospital, other than in the custody of the Marshal's Service for court appearances, he is to be remanded to the MCC.

17. Marshals shall have the authority to take all steps that in their judgment are required to assure their own safety, the safety of the defendant and the safety of the community in carrying out this Order.

18. The defendant shall sign a bond of $1.2 million of equity secured by real property, as was previously done pursuant to Magistrate Judge Caden's Order dated September 16, 1992. A violation of any of the conditions of release will result in the forfeiture of these assets.

19. This Order is stayed until 5:00 p.m. on February 19, 1993.

SO ORDERED.

Jack B. Weinstein

JACK B. WEINSTEIN
U.S.D.J.

Dated: Brooklyn, New York

February 19, 1993

## SUPPLEMENTAL MEMORANDUM AND ORDER

Following issuance of its memorandum and order of February 23, 1993, the court was advised that the infection of defendant's left orbit had been cured and that hospitalization was no longer required. Defendant was returned to the Metropolitan Correctional Center (MCC).

He has now applied for admission to the Cabrini Hospice. A bed is being held for him.

Begun as a federal demonstration project, Cabrini Hospice is now the oldest and largest hospital-based hospice program in New York City. It was found to address "the need to provide ... terminally ill individuals with highly personalized palliative and supportive care during the final stages of illness." The program emphasizes the necessity of treating and managing a terminal illness as a crisis affecting the entire family. The services of Cabrini Hospice are available for terminally ill AIDS patients.

The government opposes transfer of defendant on the ground that his medical needs can be dealt with adequately at the MCC. This is probably true with respect to his physical ailments. The MCC cannot, however, deal with defendant's increasingly acute psychological and emotional problems. Nor can it ameliorate the suffering of the family.

The Cabrini program is designed to ease the patient's and the family's distress. Emotional and compassionate considerations during this difficult passage into the unknown need not be ignored by the courts.

It must be emphasized that defendant is still presumed to be innocent. He is deprived of his liberty only to prevent his flight and danger to the community. Both of these problems can be solved by having guards constantly posted at the expense of defendant's family.

The order previously entered is modified to provide that the place where defendant will be held under guard is the Cabrini Hospice, 227 East 19th Street, New York, New York.

SO ORDERED.

Jack B. Weinstein

Jack B. Weinstein
United States District Judge

Dated: Brooklyn, New York

March 5, 1993