# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA )
)
)
Plaintiff, )
v. )
) Magistrate No. 17-00046 (RMM)
DAVID ALAN JOHNSTON, )
)
Defendant. )
_____)

## MEMORANDUM SUPPORTING PRETRIAL RELEASE ORDER

This matter comes before the Court on a motion by Defendant David Alan Johnston ("Defendant" or "Mr. Johnston") seeking limited pretrial release for the purpose of obtaining medical treatment for his colon cancer, and a cross-motion by the United States ("United States" or "the prosecution") requesting that Mr. Johnston remain detained pending trial. *See* Motion for Limited Pretrial Release for the purpose of Obtaining Medical Treatment for His Cancer Diagnosis, ECF No. 5 ("Release Motion"); Government's Memorandum In Support of Pretrial Detention of Defendant David Johnston, ECF No. 7 ("Detention Memorandum"). Mr. Johnston has been charged by Criminal Complaint with one count of Travel With Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b), and has been held without bond since February 1, 2017. The Court conducted multiple hearings to develop a record upon which to review the pending detention motions. As explained on the record at the conclusion of the September 21, 2017 detention hearing, the Court has reviewed the proffered evidence, the parties' arguments, and applicable law, and concludes that Mr. Johnston should be released into home detention for a twenty-one day period for the limited purpose of obtaining medical treatment.

## Factual Background

The Court makes the following factual findings based on the proffer presented by the United States in the Criminal Complaint and at the detention hearings:

On January 22, 2017 an individual using the username "Dave Johnston" responded to a message posted on a social media forum by an undercover officer from the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force. The individual, later identified as Mr. Johnston, alluded that he had a sexual interest in minors. In the ensuing conversation, the undercover officer represented that he was the father of a nine-year-old daughter and indicated that he was sexually abusing her. Mr. Johnston responded by indicating that he previously had a sexual relationship with one of his daughters. Mr. Johnston provided the undercover officer with his username to an application called Kik, a mobile messaging application that allows users to send messages and other content, including videos and images, to other users.

On January 26, 2017 the undercover officer began communicating with Mr. Johnston through Kik. Mr. Johnston's Kik username included his initials and the application displayed the name "Dave Johnston" in the messenger window. Mr. Johnston provided the undercover officer with other identifying personal information, such as where he lived, how old he was, how many children he had, and even his work schedule. The same day, law enforcement was able to use this information to conduct a search of a database that produced records for Mr. Johnston, including a driver's license photograph.

On January 27, 2017 Mr. Johnston and the undercover officer continued their conversation. During this conversation, Mr. Johnston asked the officer for explicit photographs of the officer's purported daughter. The undercover officer responded that he needed a

2

photograph of Mr. Johnston holding up two fingers as a gesture of trust. In response, Mr. Johnston sent the officer a photograph of himself that matched the driver's license photograph officers had previously obtained. After Mr. Johnston asked again for explicit photographs, the officer invited Mr. Johnston to meet him and his daughter for the purpose of engaging in sexual activity with his daughter. Mr. Johnston accepted the invitation to meet. The officer and Mr. Johnston began to make specific plans about when to meet and what the meeting would involve. For example, Mr. Johnston and the officer discussed whether Mr. Johnston had any sexually transmitted diseases, where they would meet, what specific sexual acts would occur at the meeting, and how long the meeting would take. Mr. Johnston's statements take together show a desire to go through with the meeting. On January 30, 2017, the day before the meeting, Mr. Johnston expressed excitement and anticipation about meeting the officer's daughter the following day.

On January 31, 2017, the undercover officer and Mr. Johnston agree to meet at 1:00 P.M. at a bar in the Chinatown Neighborhood of Washington, D.C. Just before 1:00 P.M. Mr. Johnston met with the officer at the predetermined location, before continuing to the officer's purported apartment. Mr. Johnston was arrested as he and the officer were walking toward the apartment. After arrest, Mr. Johnston claimed that he never intended to engage in any sexual activity and that his actions and communications were just a fantasy. However, he admitted to traveling to Washington D.C. to meet with the undercover officer.

## Procedural Background

The Court makes the following factual findings based upon its review of the record of this case and the proffer made by the defendant at the detention hearings:

3

On February 1, 2017, Mr. Johnston was charged by Complaint with one count of Travel with Intent to Engage in Illicit Sexual Conduct in violation of 18 U.S.C. § 2423(b). *See* ECF No. 1. He appeared for an initial appearance the same day before Magistrate Judge G. Michael Harvey. Judge Harvey granted the United States' motion for temporary detention and ordered that Mr. Johnston be held without bond. *See* Feb. 1, 2017 Minute Entry. A Preliminary Hearing/Detention hearing was originally scheduled for February 6, 2017, however that hearing was continued a number of times while the parties engaged in plea negotiations. Consequently, Mr. Johnston has been continuously detained at a facility run by the District of Columbia Department of Corrections ("D.O.C.") since his initial arrest on January 31, 2017.

In March, Mr. Johnston began feeling ill. *See* Release Motion, ECF No. 5 at 3. He began having reoccurring episodes of dizziness, which were attributed to his age and a change in blood pressure medication. *See id.*. However on June 5, 2017, after more severe episodes of dizziness and anemia, Mr. Johnston was taken to the Emergency Room at United Medical Center. *Id.* at 3-4. On June 12, he was diagnosed with colon cancer. *See id.* at 3. Although Mr. Johnston was originally scheduled to have a surgical procedure shortly after his diagnosis, in late June he refused the procedure in order to consult with his wife. After consulting with his wife, Mr. Johnston rejected a rescheduled oncology appointment because he believed he would be able to use his own private insurance to receive medical care. After realizing that this would not be the case, Mr. Johnston began asking D.O.C. officials to reschedule his treatment beginning on July 18, 2017. Mr. Johnston contends that he has not received any further meaningful treatment from D.O.C. since he began making those requests.

As a result of this lapse in treatment, on September 4, 2017 Mr. Johnston filed a Motion for Limited Pretrial Release for the purpose of Obtaining Medical Treatment for His Cancer

Diagnosis.  *See id.*  Mr. Johnston argued that he was receiving insufficient medical care, *id.* at 3,

and asked to be released into the custody of his wife, so that he could receive treatment from

Mary Washington Hospital near his home in the Eastern District of Virginia (E.D.V.A.) through

his own private insurance.  *Id.* at 5.  Mr. Johnston proffered that in order to facilitate his release,

he would accept any conditions imposed by the Court.  *Id.* at 6-7.  Mr. Johnston attached two

exhibits in support of his Release Motion: (1) a letter from his wife expressing her willingness to

serve as a third-party custodian should he be released and (2) a sealed copy of select medical

records that confirm his diagnosis.  *See* Release Motion Ex. A (filed under seal at ECF No. 6);

Release Motion Ex. B, ECF No. 5-2.

The United States filed a Memorandum in Support of Pretrial Detention in which it

argued that Defendant should continue to be detained because he poses a significant danger to

the community and D.O.C. could provide adequate medical care.  *See* Detention Memorandum,

ECF No. 7.  In support of its request for pretrial detention, the United States attached a letter

from a doctor at Unity Health Care averring that D.O.C. could effectively treat Mr. Johnston's

illness.  *See* Detention Memorandum Ex. 1, ECF No. 5-1.

The Court held a Preliminary/Detention Hearing on September 9, 2017.[1]  Mr. Johnston

waived the preliminary hearing, and after considering the parties' motions and oral arguments

the Court elected to continue the detention hearing to allow the parties and pretrial services to

provide supplemental information regarding, *inter alia,* the specifics of Mr. Johnston's medical

treatment while in D.O.C. custody, the nature and timing of any treatment plans proposed by the

parties, and what resources the E.D.V.A. Pretrial Services Agency could employ to supervise and

---

[1] The United States cited 18 U.S.C. § 3142(f)(1)(A)to support its request for a detention hearing, and Mr. Johnston did not dispute the United States' contention that the Bail Reform Act authorized the Court to hold a detention hearing in this matter.

monitor Mr. Johnston should he be released. At the Continued Detention Hearing held on September 13, 2017, the parties responded to the Court's questions. Additionally, the Court learned that E.D.V.A. had software capable of monitoring internet activity on devices in Mr. Johnston's home, and that E.D.V.A. could provide Mr. Johnston with a GPS tracker that would report violations to officers in real time. The Court again continued the hearing, until September 19, 2017, in order to obtain more specific information about whether E.D.V.A.'s internet monitoring capabilities could be used on multiple devices. At the Continued Detention Hearing held on September 19, 2017, the Court learned that the monitoring software could be installed on any compatible device in Mr. Johnston's home. The Court continued the hearing until September 21, 2017 so that pretrial services could determine whether the electronic devices in the Johnston family's home were compatible with E.D.V.A's computer monitoring software. The Court held its final hearing on September 21, 2017, and issued an order releasing Mr. Johnson into the custody of his wife, subject to several conditions including home detention and GPS monitoring. The United States orally moved for an emergency stay of the release order, to permit it to appeal, and the Court orally granted the stay motion.

## Legal Standard

"In our society, liberty is the norm and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.*, articulates the circumstances that trigger that exception. Specifically, it authorizes a judicial officer to order the detention of a defendant before trial if the judicial officer determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

A finding that a defendant poses a danger to the community, or that there is a serious risk that the defendant will flee, provides an adequate basis to order pretrial detention.[2] *See Salerno*, 481 U.S. at 755; *United States v. Lee*, 195 F. Supp. 3d 120, 124 (D.D.C. 2016); *United States v. Henry*, 935 F. Supp. 24, 25 (D.D.C. 1996). A detention decision based upon the defendant's dangerousness to the community must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f); *see United States v. Smith*, 79 F.3d 1208, 1209 (D. C. Cir. 1996). In contrast, a detention decision based upon a finding that no set of conditions will reasonably assure the defendant's appearance in court "need only be supported by a 'preponderance of the evidence.'" *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) (quoting *United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986)); *see United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Anderson*, 382 F. Supp. 2d 13, 14 (D.D.C. 2005).

The Bail Reform Act directs judges to consider four factors in determining whether any conditions of release will reasonably assure a defendant's future presence in court or assure the safety of any other person and the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *Xulam*, 84 F.3d at 442. The court must consider the available information pertaining to all four factors, even if the parties' arguments do not address each factor. *See* 18 U.S.C. § 3142(g); *United States v. Hassanshahi*, 989 F. Supp. 2d 110, 117 (D.D.C. 2013).

---

[2] The United States does not argue that Mr. Johnston's risk of flight also warrants pretrial detention, and therefore the Court need not address that issue in this Memorandum.

When there is probable cause to believe that a defendant committed certain offenses, a rebuttable presumption applies that no condition or combination of conditions will be effective. *See* 18 U.S.C. § 3142(e)(2), (3). Once this rebuttable presumption has been triggered, "the presumption operate[s] *at a minimum* to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (emphasis in original). Furthermore, "even if the defendant offers evidence to counter the presumption, the presumption does not disappear entirely." *United States v. Hunt*, 240 F.Supp.3d 128, 132. Instead, the "presumption is incorporated into the other factors . . . in determining whether to grant a conditional release and is given substantial weight." *United States v. Cherry*, 221 F.Supp.3d 26, 32 (D.D.C. 2016) (quoting *United States* v. *Ali*, 793 F.Supp.2d 386, 391 (D.D.C. 2011)); *see also United States v. Hite*, 76 F.Supp.3d 33, 37 (D.D.C. 2014) (detaining the defendant even though the defendant had presented enough evidence to rebut a presumption of detention).

## Analysis

This Court's resolution of the pending motions turns on the answer to two questions: (1) has Mr. Johnston rebutted the statutory presumption that pretrial detention is necessary to protect the safety of the community?; and (2) if Mr. Johnston has rebutted that presumption, has the United States shown, by clear and convincing evidence, that this Court cannot craft release conditions that would reasonably assure the safety of the community and others? As explained on the record at the September 21, 2017 hearing, the Court concludes that Mr. Johnston's need for prompt cancer testing and treatment, paired with his belief that if he remains in D.O.C. custody such treatment will be delayed to a degree that imperils his life, rebuts the statutory presumption of detention. The Court further concludes that it can adequately ensure the safety of

8

the community by imposing stringent release conditions tailored to the nature of the charges Mr. Johnston faces and his need for medical treatment, and by designating his spouse (Mrs. Johnston) as a third-party custodian. Although the Bail Reform Act does not require the Court to issue written findings and conclusions to support a decision to release a defendant, *see* 18 U.S.C. § 3142(h), this opinion provides a comprehensive statement of the reasoning on which the Court based those conclusions.

### *Applicability of Rebuttable Presumption of Detention*

Mr. Johnston acknowledged in his Release Motion that he has been charged with a crime that carries a rebuttable presumption that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(2). He is accused of violating 18 U.S.C. § 2423(b), which is an offense involving a minor victim. *See* 18 U.S.C. § 3142(e) (applying presumption of detention "if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense involving a minor victim under [18 U.S.C. § 2423]"); *United States v. Beauchamp-Perez*, 822 F. Supp.2d 7, 9 (D.D.C. 2011) (applying rebuttable presumption in case involving violations of § 2423(b)). The fact that 18 U.S.C. § 2423(b) is a crime of violence provides another basis to apply the rebuttable presumption in this case. *See United States v. Breeden*, No. 15-0506, 2015 WL 13310427, *7 (D.D.C. Nov. 16, 2015) (citing 18 U.S.C. § 3165 for proposition that Congress has designated Section 2423(b) as a crime of violence). As Mr. Johnston has not been indicted, the Court cannot rely upon an indictment to establish probable cause to believe that Mr. Johnston committed the offense with which he has been charged. However, the United States has proffered evidence of internet communications between Mr. Johnston and an undercover officer in which Mr. Johnston discusses engaging in sexual acts with a young girl and made

9

arrangements to meet in the District of Columbia for the purpose of performing those acts with the undercover officer's fictitious nine-year old daughter. Mr. Johnston admitted that he traveled to the District of Columbia to meet with the undercover officer, and was in fact apprehended after traveling to the District of Columbia for the proposed meeting. The Court finds that the prosecution's proffer provides probable cause to believe that Mr. Johnston committed the offense. Accordingly, a rebuttable presumption of detention applies.

### *Weighing the Statutory Factors and Applying the Rebuttable Presumption*

The first factor, the nature and circumstances of the offense, favors detention. The Bail Reform Act directs the Court to consider as part of its analysis of this factor whether the charged offense is a crime of violence or involves a minor victim. 18 U.S.C. § 3142(g). Mr. Johnston is charged with traveling to engage in sexual acts with a 9 year old girl. As discussed above, that is both a crime of violence and a crime involving a minor victim.

The second factor, the weight of the evidence, also favors detention. The United States proffered evidence of online conversations in which Mr. Johnston discusses in graphic terms the illicit sexual acts that he would like to engage in and observe. The alleged contents of those communications are deeply disturbing. Mr. Johnston describes a fictitious prepubsescent girl as "sexy" and requests naked photographs of the undercover officer's 9 year old daughter. He also arranges to meet with the undercover officer and the officer's 9 year old daughter, and expresses impatience and excitement about the upcoming meeting. In the online conversations, Mr. Johnston and the undercover officer discuss the lewd acts that they will engage in during the meeting, and Mr. Johnston proposes to let the child suck his penis, and asserts that he can "stroke while she [the child] Sucks" the undercover officer, and then "cum above [the child's] pussy." Although Mr. Johnston stated after his arrest that it was all a fantasy, he admitted to traveling to

10

meet with the UC agent and was apprehended after he had traveled to DC for the proposed meeting. Therefore, the United States appears to have strong evidence supporting the charges.

Turning to the defendant's history and characteristics, Mr. Johnston's history includes information that makes the Court very reluctant to release him. Mr. Johnston has no prior state or federal convictions. But he was court martialed through the military justice system and dishonorably discharged for having molested his young daughter. Although that was more than twenty-five years ago, the fact that it involves sexual abuse of a young girl has very troubling parallels to the charges Mr. Johnston currently faces.

However, another aspect of Mr. Johnston's history and characteristics — his current medical history — makes this case unusual and led the defense to seek limited pretrial release. While in custody, Mr. Johnston was diagnosed with colon cancer. Additional testing is necessary to determine how advanced the cancer is and what course of treatment is necessary. The medical records unambiguously indicate, as early as June 2017, that any delay in treatment poses a risk that the cancer will spread locally and metastatically. The medical director of Unity Health Care, D.C. D.O.C. ("Unity"), submitted a letter averring that Unity is capable of treating inmates with cancer and thus can provide adequate medical care to Mr. Johnston. *See* Detention Memorandum Ex. 1, ECF No. 7-1. The D.O.C. has attempted to provide care, through Unity and hospitals with which it partners, and initially appears to have been moving swiftly towards surgery. But since mid-July, there have been significant delays; referrals and follow up appointments deemed necessary as early as July 2017 remain outstanding.[3]

The prosecution faults Mr. Johnston for the delay in treatment, pointing to the fact that on July 3, 2017, Mr. Johnston declined a recommended oncology treatment, citing a desire to

---

[3] Although an appointment was scheduled to occur on September 18, 2017, Mr. Johnston missed that appointment because the transport vehicle broke down while he was en route to the hospital.

11

discuss it with his wife and secure private medical care. But less than two weeks later, on July 18, 2017, Mr. Johnston advised the D.O.C. providers that he wished to proceed with the recommended consult given that he expected to remain incarcerated for several months. The medical records clearly indicate, as early as July 18, 2017, that a referral was necessary in light of Mr. Johnston's desire to proceed with treatment. Yet it is undisputed that Mr. Johnston was not scheduled for an appointment in July or August. Mr. Johnston contends that his first follow-up appointment, an oncology consult at Howard University Hospital, occurred on September 1, 2017. The prosecution does not rebut that factual assertion. At that appointment, Mr. Johnston was advised that he was not at the correct stage of treatment for that consultation, and that given the passage of time he needed a new appointment so that physicians could review the records and conduct follow-up diagnostic tests.

Mr. Johnston is insured and has the means to obtain private medical care. He has identified providers who are poised to move quickly, and could schedule an appointment within less than a week. The next available appointment is September 26, 2017.[4] However, because Defendant's family resides outside of the District of Columbia — in Fredericksburg, VA — the hospital where Mr. Johnston would like to obtain medical care (Mary Washington Hospital) is in the Fredericksburg area. That is not a location to which Mr. Johnston could readily be transported for appointments while in D.O.C. custody.

Mr. Johnston has strong family support. His spouse, Mrs. Johnston, has expressed a willingness to serve as a third-party custodian, and indicates that she has flexible work arrangements that would allow her to work from home. She is willing to work from home for the duration of any home detention to minimize the extent to which Mr. Johnston would be home

---

[4] Mr. Johnston could have been seen earlier if the Court had determined at an earlier detention hearing that release was appropriate.

alone. Mrs. Johnston also is willing to take any steps the Court may deem necessary to make their home suitable for home detention, including removing certain electronic devices from the home and paying for GPS monitoring and the installation of software to monitor computer usage.

The fourth factor evaluates the nature and seriousness of the danger that the defendant poses to the community. If Mr. Johnston were released and given access to minors, either directly or through the internet, that would severely endanger the community. If the person on the other side of Mr. Johnston's internet conversations had been the parent of a young child, and not an undercover agent, those conversations could have led to the sexual abuse of a young child. The danger that presents to the community can hardly be overstated.

The foregoing facts inform this Court's analysis of whether Mr. Johnston has rebutted the presumption of dangerousness, and whether the four statutory factors, when weighed against each other, indicate that detention is warranted. To rebut the presumption, a defendant must proffer "some credible evidence" that is contrary to Congress's judgment that individuals charged with certain crimes ordinarily cannot safely be released into the community. *Alatishe*, 768 F.2d at 371. Although it is a close question, the Court finds that Mr. Johnston has rebutted the presumption that he is too dangerous to be released.

Mr. Johnston has presented undisputed evidence that he has colon cancer, and the medical records establish that he has an acute and immediate need for further diagnostic testing and cancer treatment. Further, Mr. Johnston and his family believe, based on the delays discussed above, that he will not obtain cancer treatment with the requisite speed if the medical care is provided through D.O.C. in partnership with Unity and local hospitals. From Mr. Johnston's perspective his life — not only his liberty — is on the line. That creates a powerful incentive to abide by any release conditions the Court may impose.

13

The prosecution argues that having his life in jeopardy makes Mr. Johnston more dangerous because he may view a period of release as his last opportunity to engage in the conduct that gave rise to the instant charges. The defense counters that Mr. Johnston would be focused on cancer treatment and recovery and that there is little risk that he would jeopardize that treatment by using the internet for illicit purposes or engaging in other dangerous or prohibited conduct. The prosecution's argument might be plausible if Mr. Johnston had nothing to lose. But here the stakes are too high. Thus the Court finds that Mr. Johnston's need for prompt diagnosis and treatment of his colon cancer, paired with his belief that he will not receive that care if he remains in D.O.C. custody, differentiates this case from the ordinary fact pattern in which being accused of a crime of violence or an offense involving minors makes a defendant too dangerous to be released. *Compare Breeden*, 2015 WL 13310427, at \*7-10 (concluding healthy defendant charged with violating § 2423(b) failed to overcome presumption of detention or to demonstrate that release conditions would adequately protect community) *with United States v. Scarpa*, 815 F. Supp. 88, 93 (E.D.N.Y. 1993) (concluding that "[o]verriding principles of our system of justice require the conditional release of" terminally ill defendant facing multiple murder and racketeering charges to private medical facility "despite his proven dangerous propensities" given that prison medical facilities could not adequately manage his medical condition).

The fact that Mr. Johnston has rebutted the presumption does not end the Court's analysis. For even if Mr. Johnston has every incentive to comply with release conditions, the Court must still decide whether, in light of the other statutory factors, there are conditions of release that can reasonably assure the safety of the community. The presumption does not drop

14

out altogether, and the Court must decide whether Mr. Johnston's cancer diagnosis and need for prompt treatment outweigh the other aspects of this case that weigh in favor of detention.

Although Mr. Johnston's health and characteristics are only one of the four statutory factors, the Court finds that his urgent need for cancer treatment outweighs the remaining statutory factors and makes limited pretrial release appropriate. D.O.C.'s failure to provide the care Mr. Johnston needs on a timely basis differentiates his case from those where courts have determined that defendants should remain detained and have their medical conditions treated through the relevant correctional facilities. *See generally, e.g.*, *United States v. Parker*, 517 F. Supp.2d 375, 376-77 (D.D.C. 2007) (denying request for pretrial release and concluding that defendant's health problems could not be dispositive because he "can receive the medical treatment he requires while detained at the Correctional Treatment Facility"); *United States v. Hammond*, No. 16-121, 2016 WL 7384175, at *1, 4 (W.D. Pa. Dec. 21, 2016) (concluding defendant should be detained notwithstanding his cancer and noting that he could continue with private doctor's treatment plan during his custody in light of Marshals Service's approval of "all oncology appointments and treatments"). The record gives this Court little confidence that Mr. Johnston could receive efficient and prompt cancer treatment if he remains in D.O.C. custody.

The Court concludes that, given the unique circumstances of this case, it can craft stringent release conditions to protect the safety of the community. Significantly, the Bail Reform Act asks only whether release conditions could "*reasonably assure*" the safety of the community and others, and does not require the Court to find that release conditions would *completely guarantee* the safety of the community. As noted above, the danger arises if Mr. Johnston has contact with minors, either directly or through the internet. The Court can reasonably assure that Mr. Johnston has no contact with minors by making that a release

15

condition, and designating Mrs. Johnston as a third-party custodian who swears to ensure that he abides by that condition. The Court can further assure that Mr. Johnston has no contact with minors by requiring him to be confined to his home, with the exception of medical appointments and court appearances, and subject to GPS monitoring.[5]

Ensuring that Mr. Johnston cannot communicate with or have other contacts with minors through the internet is more challenging. The internet is ubiquitous in modern society, and the Johnstons have multiple devices within their home that can be used to access the internet. To mitigate the risk that Mr. Johnston would use the internet to pursue illicit activities with minors, the Court will impose a release condition that prohibits Mr. Johnston from accessing the internet or using any electronic device that is capable of accessing the internet. Again, Mrs. Johnston will be a third-party custodian who swears to ensure that Mr. Johnston abides by that condition and to report any violations to pretrial services. The Court will further require that new passwords be set for all devices within the home that can access the internet, and that those new passwords not be shared with Mr. Johnston.

The prosecution notes that imposing computer and internet restrictions requires a leap of faith because the Court must trust Mr. Johnston to abide by those conditions. This Court expressed a similar concern in *Breeden*, finding that the pretrial services could not monitor the defendant's compliance with proposed release conditions and his parents could not be counted on to do so. *See Breeden*, 2015 WL 13310427, at *9-10. But the Pretrial Services Agency in the Eastern District of Virginia has capabilities exceeding those of this jurisdiction's pretrial services, including software that monitors computer and internet usage and will trigger an alert if

_____

[5] As stated in the Addendum to the Release Order, Mr. Johnston shall bear the cost of the GPS monitoring.

activity consistent with the illicit conduct at issue in this case occurs. That monitoring provides a backstop to prevent dangerous internet-based activities in the event that Mr. Johnston violates the Court's restriction prohibiting internet use. Therefore the Court will impose a condition requiring that the Johnstons consent, and pay the necessary fees, to have the E.D.V.A. Pretrial Services Agency install the software necessary to monitor computer access. The Court will further order, as a condition of release, that any electronic devices with internet capabilities that cannot be reliably monitored through use of that software, including without limitation Apple tablets and devices, be removed from the home during Mr. Johnston's period of home detention.

Other conditions are appropriate here as well. Given that a telephone could be used to contact minors, Mr. Johnston shall not use telephones except in cases of emergency. Given the defense's suggestion that alcohol played a role in Mr. Johnston's alleged behavior, Mr. Johnston shall not consume any alcohol or drugs. Finally, Mr. Johnston shall participate in sex offender assessment and treatment.

The Court relies heavily on Mr. Johnston's wife to meet her obligations as third-party custodian and ensure Mr. Johnston's compliance with these release conditions. The prosecution questioned whether Mrs. Johnston is a reliable custodian, due in part to the reluctance a person may have to report a spouse's noncompliance and subject the spouse to reincarceration. However, Mrs. Johnston has reviewed the allegations in court filings and acknowledged the gravity of the charges against Mr. Johnston. She also acknowledged the danger that an individual who committed the conduct Mr. Johnston has been charged with would presents to the community. Mrs. Johnston has agreed to work from home in order to monitor Mr. Johnston and ensure that he complies with any release conditions the Court sets. Mrs. Johnston has further demonstrated her commitment by traveling to DC for each court appearance, and by being

17

proactive in scheduling doctor's appointments. She has no criminal record, and pretrial services found no basis to question her suitability to serve as a custodian. Mrs. Johnston expressed under oath her concern that pretrial release is the only way for Mr. Johnston to promptly receive the treatment and care that he needs and her belief that D.O.C. had proven unable to promptly address Mr. Johnston's medical needs. She understands the stakes and how important it is that Mr. Johnston comply with his release conditions. The Court found Mrs. Johnston's testimony persuasive and thus trusts her to abide by her responsibilities as a third-party custodian of Mr. Johnston.

For the foregoing reasons, the Court will grant Defendant's motion for limited pretrial release and deny without prejudice the United States' motion for pretrial detention. The Court emphasizes that it has not determined that Mr. Johnston should be released indefinitely. This is a temporary release to home detention that is narrowly tailored to respond to the exigent and unusual circumstances presented by Mr. Johnston's cancer diagnosis and the status of his testing and treatment. Mr. Johnston's next appointment is September 26, and it appears that the outcome of that appointment will determine when his next appointment, or series of appointments, occurs, and whether or when surgery will be needed. Therefore the Court will release Mr. Johnston on home detention for a period of 21-days, through and including October 12, 2017, subject to the conditions discussed above and listed in the Release Order. The Court will consider whether to extend that release period once defense counsel has provided supplemental information regarding a proposed treatment plan and schedule. Those issues will be addressed at a status conference set for October 4, 2017, and the Court will then determine whether to return Mr. Johnston to D.O.C. custody or extend his period of home detention.

18

**Conclusion**

Based upon consideration of all of the evidence and the factors set forth in § 3142(g), and weighing all the lesser restrictive alternatives to pretrial detention, this Court concludes by clear and convincing evidence that Defendant should be released for a twenty-one day period subject to the conditions set forth in the Release Order issued on September 21, 2017.

Dated: September 22, 2017

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE